IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| NEIL WALKER, #095197, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:17-CV-591-RAH |
| | ) | (WO) |
| | ) | |
| JEAN DARBOUZE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I.  INTRODUCTION**[1]

This 42 U.S.C. § 1983 action is before the court on a complaint and amendment thereto filed by Neil Walker, an indigent state inmate, challenging the medical treatment provided to him for a urinary tract infection about which he initially complained in January of 2017 while confined at the Easterling Correctional Facility.  Doc. 1 at 2–3; Doc. 7 at 1–2.  The defendants remaining in this case are Jean Darbouze, Kay Wilson and Susanne Bush,[2] medical personnel employed by the contract medical care provider for the Alabama Department of Corrections at the time relevant to the complaint, and Walter Myers, the warden of Easterling during such time.[3]

---

[1] All documents and attendant page numbers cited herein are those assigned by the Clerk of this court in the docketing process.

[2] Walker initially identifies Nurse Bush as Suezine Bush.  Doc. 7.  However, this defendant's true name is Susanne Bush and Walker subsequently utilizes her correct name in various documents filed with the court. For purposes of this Recommendation, the court will refer to Nurse Bush by her correct name – Susanne Bush.

[3] Darbouze, a physician, served as the Medical Director at Easterling, Wilson, a registered nurse, acted as the Health Services Administrator at the facility whereas Bush served as a licensed practical nurse.

In the complaint, Walker challenges the medical treatment provided to him by Dr. Darbouze for a urinary tract infection which he believes caused a cancerous tumor in his bladder.  Doc. 1 at 3.  In the amendment to the complaint, Walker asserts Nurse Bush "participated in pulling [his] medical records from outside treatment" and maintains Nurse Wilson "as head of staff[] plotted . . . to further injur[e] Plaintiff" after receipt of his "files from outside treatment."  Doc. 7 at 2–3.  Finally, Walker complains that defendant Myers as warden is "the superior of [the] medical staff[]" and is therefore responsible for their actions.  Doc. 7 at 1.  Walker seeks treatment at a private cancer center and monetary damages from the defendants for the alleged violations of his constitutional rights.  Doc. 1 at 4; *see also* Doc. 7 at 2 (request for monetary damages) and Doc. 14 at 3 (amendment to monetary damages).  He sues the defendants only in their individual capacities.  Doc. 1 at 4; Doc. 7 at 2; Doc. 14 at 3.

The defendants filed special reports and relevant evidentiary materials in support of their reports, including affidavits and certified copies of Walker's medical records, addressing the claims raised in the complaint.  In these documents, the defendants adamantly deny they acted in violation of Walker's constitutional rights regarding the medical treatment provided to him for his urinary tract infection and cancerous tumor.  Specifically, the medical defendants maintain Walker received appropriate treatment for his conditions, including treatment by off-site specialists.  In addition, Warden Myers maintains he had no involvement whatsoever with the medical treatment provided to Walker as all decisions regarding his treatment were made by properly trained health care professionals.

After reviewing the special reports filed by the defendants, the court issued an order on December 5, 2017, directing Walker to file a response to each of the arguments set forth by the defendants in their reports and advising him that his response should be supported by affidavits or statements made under penalty of perjury and other appropriate evidentiary materials. Doc. 28 at 2. This order specifically cautioned that "**unless within fifteen (15) days from the date of this order a party . . . presents sufficient legal cause why such action should not be undertaken** . . . the court may at any time [after expiration of the time for the plaintiff filing a response to this order] and **without further notice to the parties** (1) treat the special report[s] and any supporting evidentiary materials as a motion for summary judgment and (2) after considering any response as allowed by this order, rule on the motion for summary judgment in accordance with the law." Doc. 28 at 3 (emphasis in original). Walker filed unsworn responses to this order on January 26, 2018, Docs. 36 & 37, but did file an affidavit in support of his initial response, Doc. 36-1, and also provided medical records and an inmate request form in support of the second response, Doc. 37-1.[4]

Pursuant to the directives of the above described order, the court now treats each of the special reports filed by the defendants as a motion for summary judgment. Upon consideration of the defendants' motions for summary judgment, the evidentiary materials

---

[4]This court declines to consider Walker's responses to the defendants' reports in determining summary judgment because these responses are not sworn statements nor signed with an averment that they were made under penalty of perjury. *See* 28 U.S.C. § 1746; *Holloman v. Jacksonville Housing Auth.*, 2007 WL 245555, *2 (11th Cir. Jan. 20, 2007) (noting that "unsworn statements, even from *pro se* parties, should not be considered in determining the propriety of summary judgment."); *Gordon v. Watson*, 622 F.2d 120, 123 (5th Cir. 1980) (holding that "the court may not consider [the pro se inmate plaintiff's unsworn statement] in determining the propriety of summary judgment."). The court will, however, consider Walker's affidavit submitted in support of the first response.

filed in support thereof, the sworn complaint, as amended, and affidavit in response filed by Walker, the court concludes that summary judgment is due to be granted in favor of the defendants.

## II.  SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law." *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (internal quotations omitted); Rule 56(a), Fed. R. Civ. P. ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (holding that moving party has initial burden of showing there is no genuine dispute of material fact for trial). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present appropriate evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Celotex*, 477 U.S. at 322–24; *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011) (holding that moving party discharges his burden by showing the record lacks

evidence to support the nonmoving party's case or the nonmoving party would be unable to prove his case at trial).

When the defendants meet their evidentiary burden, as they have in this case, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact [by citing to materials in the record including affidavits, relevant documents or other materials], the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it[.]"); *Jeffery*, 64 F.3d at 593–94 (holding that, once a moving party meets its burden, "the non-moving party must then go beyond the pleadings, and by its own affidavits [or statements made under penalty of perjury], or by depositions, answers to interrogatories, and admissions on file," demonstrate that there is a genuine dispute of material fact).  In civil actions filed by inmates, federal courts "must distinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities.  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage."  *Beard v. Banks*, 548 U.S. 521, 530 (2006) (internal citation omitted).  This court will also consider "specific facts" pled in a plaintiff's sworn complaint when considering his opposition to summary judgment.  *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014);

*Barker v. Norman*, 651 F.2d 1107, 1115 (5th Cir. Unit A 1981) (stating that a verified complaint serves the same purpose of an affidavit for purposes of summary judgment). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).

A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor such that summary judgment is not warranted. *Greenberg*, 498 F.3d at 1263; *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1313 (11th Cir. 2007). The evidence must be admissible at trial, and if the nonmoving party's evidence "is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986); *see also* Fed. R. Civ. P. 56(e). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice, there must be enough of a showing that the [trier of fact] could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252). Only disputes involving material facts are relevant and materiality is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248.

To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The evidence of the non-

movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. At the summary judgment stage, this court should accept as true "statements in [the plaintiff's] verified complaint, [any] sworn response to the [defendants'] motion for summary judgment, and sworn affidavit attached to that response[.]" *Sears v. Roberts*, 922 F.3d 1199, 1206 (11th Cir. 2019); *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) (holding that a plaintiff's purely self-serving statements "based on personal knowledge or observation" set forth in a verified complaint or affidavit may create an issue of material fact which precludes summary judgment); *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) (citations omitted) ("To be sure, [Plaintiff's] sworn statements are self-serving, but that alone does not permit [the court] to disregard them at the summary judgment stage . . . . Courts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving."). However, general, blatantly contradicted and merely "[c]onclusory, uncorroborated allegations by a plaintiff in [his verified complaint or] an affidavit . . . will not create an issue of fact for trial sufficient to defeat a well-supported summary judgment motion." *Solliday v. Fed. Officers*, 413 F. App'x 206, 207 (11th Cir. 2011) (*citing Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990). Additionally, conclusory allegations based on purely subjective beliefs of a plaintiff and assertions of which he lacks personal knowledge are likewise insufficient to create a genuine dispute of material fact. *See Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997). In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates there is no genuine dispute of material fact and the party moving

for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323–24; *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (holding that to establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor).  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted).  Instead, "there must exist a conflict in substantial evidence to pose a jury question." *Hall v. Sunjoy Indus. Group, Inc.*, 764 F. Supp. 2d 1297, 1301 (M.D. Fla. 2011) (citation omitted).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Although factual inferences must be viewed in a light most favorable to the plaintiff and *pro se* complaints are entitled to liberal interpretation, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact.  *See Beard*, 548 U.S. at 525.  Thus, a plaintiff's *pro se* status alone does not compel this court to disregard elementary principles of production and proof in a civil case.  Here, after a thorough and exhaustive review of all the evidence which would be admissible at trial, the court finds that Walker has failed to demonstrate a genuine dispute of material fact in order to preclude entry of summary judgment in favor of the defendants on his claims of deliberate indifference.

### III.  DISCUSSION[5]

### A.  Qualified Immunity[6]

Warden Myers raises the defense of qualified immunity to the claims lodged against him in his individual capacity, Doc. 27 at 4, the only capacity in which he is sued.  *See* Doc. 7 at 2; Doc. 14 at 3.  "The defense of qualified immunity completely protects government officials performing discretionary functions from suit [for damages] in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). "The purpose of the qualified immunity defense is to protect[] government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Youmans v. Gagnon*, 626 F.3d 557, 562 (11th Cir. 2010) (internal quotations and citations omitted).  "Qualified immunity gives government officials breathing room to make

---

[5]The court limits its review to the allegations set forth in the complaint and properly filed amendment to the complaint.  *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment."); *Ganstine v. Secretary, Florida Dept. of Corrections*, 502 F. App'x. 905, 909–10 (11th Cir. 2012) (holding that plaintiff may not amend complaint at the summary judgment stage by raising a new claim or presenting a new basis for a pending claim); *Chavis v. Clayton County School District*, 300 F.3d 1288, 1291 n. 4 (11th Cir. 2002) (noting that district court did not err in refusing to address a new theory raised during summary judgment because the plaintiff had not properly amended the complaint).

[6]The medical defendants, employees of a private medical provider contracted to provide medical treatment to Alabama inmates, also assert they are entitled to qualified immunity.  Doc. 18 at 3.  However, qualified immunity does not extend to these defendants.  *Hinson v. Edmond*, 205 F.3d 1264, 1265 (11th Cir. 2000) (holding that a physician employed by a private for-profit corporation contracted to provide medical care to inmates "is ineligible to advance the defense of qualified immunity."); *see also Edwards v. Ala. Dep't of Corrs.*, 81 F.Supp.2d 1242, 1254 (M.D. Ala. 2000) (holding that a private entity contracting with a state to provide medical services to its inmates "is not entitled to qualified immunity….").

reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quotations and citations omitted).  "Unless a government agent's act is so obviously wrong, in light of the pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor is immune from suit." *Lassiter v. Ala. A&M University Bd. of Trustees*, 28 F.3d 1146, 1149 (11th Cir. 1994).  The Eleventh Circuit has determined that the law is "clearly established" for purposes of qualified immunity "only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." *Jenkins v. Talladega City Bd. of Education*, 115 F.3d 821, 826–27 n.4 (11th Cir. 1997) (citations omitted).  The Supreme Court "ha[s] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009).  Even so, qualified immunity is only an affirmative defense to a request for damages; it has no impact on requests for declaratory or injunctive relief.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (In addressing qualified immunity, holding that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."); *Wood v. Strickland*, 420 U.S. 308, 315, n.6 (1975) ("[I]mmunity from damages does not ordinarily bar equitable relief as well."), *overruled in part on other grounds by Harlow*, *supra*.; *American Fire, Theft & Collision Managers, Inc. v. Gillespie*, 932 F.2d 816, 818 (9th Cir. 1991) (holding that qualified immunity is a defense only to monetary damages

and "does not bar actions for declaratory or injunctive relief.") (internal quotations and citations omitted).

"To receive qualified immunity, the government official must first prove that he was acting within his discretionary authority." *Gonzalez*, 325 F.3d at 1234.  In this case, it is clear "that the [correctional] defendant [was] acting within [his] discretionary authority[]" as a correctional official at the time of the actions at issue so "the burden shifts to [Walker] to show that qualified immunity is not appropriate." *Id*.; *see also Townsend v. Jefferson Cnty*., 601 F.3d 1152, 1158 (11th Cir. 2010).  To meet this burden, Walker must prove both that "(1) the defendant[] violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004); *Crosby v. Monroe Cnty*., 394 F.3d 1328, 1332 (11th Cir. 2004) (same); *Youmans*, 626 F.3d at 562 (citation omitted) ("[O]nce a defendant raises the defense [of qualified immunity and demonstrates he was acting within his discretionary authority], the plaintiff bears the burden of establishing both that the defendant committed a constitutional violation and that the law governing the circumstances was clearly established at the time of the violation.").  This court is "free to consider these elements in either sequence and to decide the case on the basis of either element that is not demonstrated." *Id*.; *Rehberg v. Paulk*, 611 F.3d 828, 839 (11th Cir. 2010) (*citing Pearson*, 555 U.S. at 241–42) (holding that the court may analyze the elements attendant to qualified immunity "in whatever order is deemed most appropriate for the case.").

### B.  Deliberate Indifference to Medical Needs

Walker alleges the medical defendants acted with deliberate indifference to a urinary tract infection and cancerous tumor.[7] Walker also argues the warden is the superior of all employees assigned to the facility and should therefore have intervened in the treatment decisions of the health care professionals to ensure that he receive appropriate medical treatment.  These assertions entitle Walker to no relief.

**1.  <u>Standard of Review</u>.**  To prevail on a claim concerning an alleged denial of medical treatment, an inmate must—at a minimum—show that the defendant acted with deliberate indifference to a serious medical need.  *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989).  Medical nor prison personnel may subject an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  *Estelle*, 429 U.S. at 106; *Adams v. Poag*, 61 F.3d 1537, 1546 (11th Cir. 1995) (holding, as directed by *Estelle*, that a plaintiff must establish "not merely the knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal to treat or a delay in [the acknowledged necessary] treatment").

Under well-settled law, neither medical malpractice nor negligence constitutes deliberate indifference:

> That medical malpractice—negligence by a physician—is insufficient to form the basis of a claim for deliberate indifference is well settled. *See Estelle*

---

[7]Walker, an inmate with no medical training, makes the conclusory allegation that the lack of treatment for the urinary tract infection resulted in the cancerous tumor.

v. Gamble, 429 U.S. 97, 105–07, 97 S. Ct. 285, 292, 50 L.Ed.2d 251 (1976);
*Adams v. Poag,* 61 F.3d 1537, 1543 (11th Cir. 1995).  Instead, something
more must be shown.  Evidence must support a conclusion that a prison
[medical care provider's] harmful acts were intentional or reckless. *See
Farmer v. Brennan,* 511 U.S. 825, 833–38, 114 S. Ct. 1970, 1977–79, 128
L.Ed.2d 811 (1994); *Cottrell v. Caldwell,* 85 F.3d 1480, 1491 (11th Cir.
1996) (stating that deliberate indifference is equivalent of recklessly
disregarding substantial risk of serious harm to inmate); *Adams,* 61 F.3d at
1543 (stating that plaintiff must show more than mere negligence to assert an
Eighth Amendment violation); *Hill v. DeKalb Regional Youth Detention
Ctr.,* 40 F.3d 1176, 1191 n. 28 (11th Cir. 1994) (recognizing that Supreme
Court has defined "deliberate indifference" as requiring more than mere
negligence and has adopted a "subjective recklessness" standard from
criminal law); *Qian v. Kautz,* 168 F.3d 949, 955 (7th Cir. 1999) (stating
"deliberate indifference" is synonym for intentional or reckless conduct, and
that "reckless" conduct describes conduct so dangerous that deliberate nature
can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

In order to establish "deliberate indifference to [a] serious medical need . . .,
Plaintiff[] must show: (1) a serious medical need; (2) the defendants' deliberate
indifference to that need; and (3) causation between that indifference and the plaintiff's
injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009).  When seeking
relief based on deliberate indifference, an inmate is required to show "an objectively
serious need, an objectively insufficient response to that need, subjective awareness of facts
signaling the need and an actual inference of required action from those facts." *Taylor*, 221
F.3d at 1258; *McElligott*, 182 F.3d at 1255 (holding that, for liability to attach, the official
must know of and then disregard an excessive risk of harm to the prisoner).

Regarding the objective component of a deliberate indifference claim, the plaintiff
must first show "an objectively serious medical need[] . . . and second, that the response
made by [the defendants] to that need was poor enough to constitute an unnecessary and

wanton infliction of pain, and not merely accidental inadequacy, negligen[ce] in diagnos[is] or treat[ment], or even [m]edical malpractice actionable under state law." *Taylor*, 221 F.3d at 1258 (internal quotations and citations omitted). To proceed on a claim challenging the constitutionality of medical care "[t]he facts alleged must do more than contend medical malpractice, misdiagnosis, accidents, [or] poor exercise of medical judgment." *Daniels v. Williams*, 474 U.S. 327, 330–33 (1986); *Estelle*, 429 U.S. at 106 (holding that neither negligence nor medical malpractice "become[s] a constitutional violation simply because the victim is incarcerated."); *Farmer*, 511 U.S. at 836 (observing that a complaint alleging negligence in diagnosing or treating "a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment[,]" nor does it establish the requisite reckless disregard of a substantial risk of harm so as to demonstrate a constitutional violation.); *Kelley v. Hicks*, 400 F.3d 1281, 1285 (11th Cir. 2005) (holding that "[m]ere negligence . . . is insufficient to establish deliberate indifference."); *Matthews v. Palte*, 282 F. App'x 770, 771 (11th Cir. 2008) (affirming district court's summary dismissal of inmate's complaint because "misdiagnosis and inadequate treatment involve no more than medical negligence."); *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) ("[A] plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment."); *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (holding that misdiagnosis of pituitary tumor sounds in negligence and is not sufficient to show deliberate indifference).

Additionally, "to show the required subjective intent . . ., a plaintiff must demonstrate that the public official acted with an attitude of deliberate indifference . . .

which is in turn defined as requiring two separate things: aware[ness] of facts from which the inference could be drawn that a substantial risk of serious harm exists [] and . . . draw[ing] of the inference[.]" *Taylor*, 221 F.3d at 1258 (internal quotations and citations omitted) (alterations in original).   Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (holding that defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference).

Furthermore, the Supreme Court explains that "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.   When medical personnel attempt to diagnose and treat an inmate, the mere fact that the chosen "treatment was ineffectual . . . does not mean that those responsible for it were deliberately indifferent." *Massey v. Montgomery County Detention Facility*, 646 F. App'x 777, 780 (11th Cir. 2016).

> In articulating the scope of inmates' right to be free from deliberate indifference, . . . the Supreme Court has . . . emphasized that not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle,* 429 U.S. at 105, 97 S. Ct. at 291; *Mandel* [*v. Doe,* 888 F.2d 783, 787 (11th Cir. 1989)].   Medical treatment violates the eighth amendment only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to

> fundamental fairness." *Rogers*, 792 F.2d at 1058 (citation omitted).  Mere
> incidents of negligence or malpractice do not rise to the level of
> constitutional violations. *See Estelle,* 429 U.S. at 106, 97 S. Ct. at 292
> ("Medical malpractice does not become a constitutional violation merely
> because the victim is a prisoner."); *Mandel*, 888 F.2d at 787–88 (mere
> negligence or medical malpractice 'not sufficient' to constitute deliberate
> indifference); *Waldrop,* 871 F.2d at 1033 (mere medical malpractice does not
> constitute deliberate indifference).  Nor does a simple difference in medical
> opinion between the prison's medical staff and the inmate as to the latter's
> diagnosis or course of treatment support a claim of cruel and unusual
> punishment. *See Waldrop,* 871 F.2d at 1033 (citing *Bowring v. Godwin,* 551
> F.2d 44, 48 (4th Cir. 1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991).

> The Eleventh Circuit,

> (echoing the Supreme Court) ha[s] been at pains to emphasize that "the
> deliberate indifference standard ... is far more onerous than normal tort-based
> standards of conduct sounding in negligence," *Goodman v. Kimbrough*, 718
> F.3d 1325, 1332 (11th Cir. 2013), and is in fact akin to "subjective
> recklessness as used in the criminal law," *Farmer*, 511 U.S. at 839–40, 114
> S.Ct. 1970; *see also id.* at 835, 114 S.Ct. 1970 ("[D]eliberate indifference
> describes a state of mind more blameworthy than negligence."). Were we to
> accept the [the theory presented here by the plaintiff] that resulting harm …
> suffices to show a criminally (and thus constitutionally) reckless mental state,
> "the deliberate indifference standard would be silently metamorphosed into
> a font of tort law—a brand of negligence redux—which the Supreme Court
> has made abundantly clear it is not." *Goodman*, 718 F.3d at 1334.

*Swain v. Junior*, 961 F.3d 1276, 1288 (11th Cir. June 15, 2020).

Moreover, "as *Estelle* teaches, whether government actors should have employed

additional diagnostic techniques or forms of treatment is a classic example of a matter for

medical judgment and therefore not an appropriate basis for grounding liability under the

Eighth Amendment."  *Adams*, 61 F.3d at 1545 (internal quotations and citation omitted).

The law is also clear that "[a] difference of opinion as to how a condition should be treated

does not give rise to a constitutional violation."  *Garvin v. Armstrong*, 236 F.3d 896, 898

(7th Cir. 2001); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (holding that mere fact an inmate desires a different mode of medical treatment does not amount to deliberate indifference violative of the Constitution); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (holding that prison medical personnel do not violate the Eighth Amendment simply because their opinions concerning medical treatment conflict with that of the inmate-patient).

The law likewise provides that an inmate is not entitled to referral to an outside physician for evaluation. *Amarir v. Hill*, 243 F. App'x 353, 354 (9th Cir. 2007) (holding that defendant's "denial of plaintiff's request to see an outside specialist . . . did not amount to deliberate indifference."); *Arzaga v. Lovett*, 2015 WL 4879453, at *4 (E.D. Cal. Aug. 14, 2015) (finding that plaintiff's preference for a second opinion is "not enough to establish defendant's deliberate indifference" as the allegation does "not show that defendant knowingly disregarded a serious risk of harm to plaintiff" nor that defendant "exposed plaintiff to any serious risk of harm."); *Dixon v. Jones*, 2014 WL 6982469, at *9 (M.D. Ala. Dec. 9, 2014) (finding that jail physician's denial of second opinion regarding treatment provided to inmate for physical injuries did not constitute deliberate indifference); *Youmans v. City of New York*, 14 F.Supp. 357, 363–64 (S.D.N.Y. 2014) (noting that "courts in the Second Circuit have held that failure to provide a second opinion is not generally a violation of a prisoner's Eighth Amendment rights."); *Schomo v. City of New York*, 2005 WL 756834, at *10 (S.D.N.Y. Apr. 4, 2005) (finding that doctor's decision to deny inmate a second opinion regarding his physical capabilities did not constitute

deliberate indifference "since prisoners are not constitutionally entitled to a second medical opinion.").

> As applied in the prison context, the deliberate-indifference standard sets an appropriately high bar. A plaintiff must prove that the defendant acted with "a sufficiently culpable state of mind." [*Farmer*, 511 U.S.] at 834, 114 S.Ct. 1970 (quotation omitted). Ordinary malpractice or simple negligence won't do; instead, the plaintiff must show "subjective recklessness as used in the criminal law." *Id.* at 839–40, 114 S.Ct. 1970. Indeed, even where "prison [or medical] officials ... actually knew of a substantial risk to inmate health or safety," they may nonetheless "be found free from liability if they responded reasonably to the risk"—and, importantly for present purposes, "even if the harm ultimately was not averted." *Id.* at 844, 114 S.Ct. 1970.

*Swain*, 961 F.3d 1276 at 1285-86.

   2. **Medical Defendants.** Walker challenges the adequacy of treatment provided to him by medical personnel for a urinary tract infection and a cancerous tumor while at Easterling from January 27, 2016 until the filing of this complaint in September of 2017. He also asserts that he should have been referred to an outside physician for evaluation and treatment of his urinary tract infection and cancer.

   The medical defendants deny they acted with deliberate indifference to Walker's medical needs and maintain that Walker had continuous access to health care personnel and received treatment from medical professionals for his complaints, including referrals to outside specialists. The medical records before the court demonstrate that medical personnel at Easterling evaluated Walker each time he appeared at sick call or a medical appointment, assessed his need for treatment, prescribed medications to him, and ordered tests and studies to assist in treating him. They provided treatment to Walker in accordance

with their professional judgment, and referred Walker to off-site specialists, including a urologist, radiologist and oncologist, for evaluation and treatment of his conditions.

The medical defendants submitted affidavits in response to the complaint filed by Walker. After a comprehensive review of the medical records submitted in this case, the court finds that the details of medical treatment provided to Walker as set forth by Dr. Darbouze in his affidavit are corroborated by the objective medical records contemporaneously compiled during the treatment process. Specifically, Dr. Darbouze addresses the allegations of deliberate indifference, in relevant part, as follows:

> I am in receipt of and I have reviewed the legal complaint filed by Alabama state inmate Neil Walker (AIS# 095197). I am aware that Mr. Walker alleges that he has not received appropriate medical treatment for an alleged urinary tract infection and that according to Mr. Walker; the urinary tract infection resulted in cancer.

> I have reviewed Mr. Walker's medical chart and Mr. Walker's medical records from August 2016 to the present time are attached hereto.

> On January 26, 2017, Mr. Walker completed a sick call request stating that he was having problems urinating.

> Mr. Walker was triaged and evaluated by a nurse on January 27, 2017, at the health care unit at the Easterling Correctional Facility. Mr. Walker complained of having problems urinating. He also complained of having a rash in the groin area.

> I personally saw and evaluated Mr. Walker on February 9, 2017. Blood and chemical tests of Mr. Walker were performed at that time.

> Mr. Walker was again seen by a nurse and evaluated on March 1, 2017. Again, Mr. Walker was complaining with problems urinating as well as a rash on his groin area. Mr. Walker informed the nurse that he had previously been provided Kenalog for his rash and it worked and he wanted the prescription renewed.

On March 2, 2017, I again personally saw and evaluated Mr. Walker. Labs were again taken of Mr. Walker.

On March 13, 2017, Mr. Walker was again evaluated by a nurse and informed the nurse that he had discovered blood in his urine.

On March 16, 2017, I again personally saw and evaluated Mr. Walker and performed a physical examination of Mr. Walker.  Further labs and blood tests were performed on Mr. Walker.

On March 22, 2017, Mr. Walker was seen by a nurse in the health care unit and again evaluated for Mr. Walker's complaints of blood in his urine.

I again personally saw and evaluated Mr. Walker on March 28, 2017. A physical examination again was performed of Mr. Walker and chemical and blood tests were again performed on Mr. Walker.  [At this time,] I [also] recommended a urology consult for Mr. Walker [with an off-site urologist].

On March 31, 2017, an ultrasound was taken of Mr. Walker.  The ultrasound was read by the radiologist as follows:

**US-retroperitoneal, complete.**

**Clinical indications:** hematuria, unspecified. **Findings:** retroperitoneal ultrasound, complete: the right kidney measure[s] 10.0 cm in length and left kidney 12.0 cm in length. Both have grossly preserved sonographic cortical medullary demarcation without mass, stones or hydronephrosis. Right renal cyst measuring up to 2.0 cm in size. There is no perinephric fluid. No AAA. IVC is not visualized. No abnormalities seen involving the urinary bladder. At least one ureteral jet is visualized. **Impression:** no acute structural renal abnormalities seen.

On April 13, 2017, Mr. Walker was seen by a urology specialist physician at Urological Associates in Dothan, Alabama.  The history taken by the urologist was as follows:

70-year old inmate referred for urinary tract infection and microscopic hematuria.  His urine has been sent for cytology by the doctor at the prison and according to his records was negative.  His last PSA was 0.24 but

I am unaware what year or date it [was] drawn. He states he has seen blood a few times. He also complains of nocturia up to 4-5 times. He states his stream is slow and his urine will start and stop. He has had radiation for his prostate cancer back in 2011. He states his urinary symptoms have been present for a year, the blood in his urine for approximately a few weeks. He has a history of prostate cancer. He denies any dysuria, pyuria, fevers, chills, flank pain, or gross hematuria.

The procedure documentation as set forth by the urologist is as follows:

> After a timeout was performed and proper informed consent obtained, the flexible cystoscope was advanced into the urethra. The meatus, anterior, and bulbar urethra were normal. Prostatic fossa was 4.0 cm with mild lateral lobe hypertrophy, coaptoing to the midline from the bladder neck to the middle of the gland. There was no significant intravesical component to the prostate. There was no ball-valving component to the median lobe. Ureteral orifices were orthotopic and normal in configuration with clear efflux seen bilaterally. Bladder mucosa was remarkable for a 2.0 cm papillary lesion located on the posterior wall. Trabeculations were seen. The cystoscope was removed from the patient without difficulty. The patient tolerated the procedure well.

I again saw and evaluated Mr. Walker on April 25, 2017. My notes indicate that Mr. Walker was recently diagnosed with a bladder tumor after the cystoscopy was performed by the radiologist. Mr. Walker was scheduled to see the urologist again for further procedures.

Mr. Walker was seen at the South East Alabama Medical Center in Dothan, Alabama, on May 11, 2017, where a biopsy was taken of Mr. Walker's bladder tumor.

A cystoscopy was also performed on May 11, 2017. The surgeon's notes [are] set forth as follows:

**Pre-operative diagnosis:** A 2 cm [posterior] wall bladder tumor.

**Post-operative diagnosis:**
1.     A 2 cm posterior right sided bladder tumor.
2.     Normal retrograde pyelograms.

**Procedures:**
1.     Cystoscopy with a retrograde pyelograms.
2.     Transurethral resection of bladder tumor.

**Description of Procedure:**

The patient was consented for the above, taken to the operating room. After an LMA anesthetic, pneumatics, Ancef, patient was placed on the cystoscopy table in lithotomy position, padding all pressure areas. Perineum was prepped with [B]etadine and draped with sterile drapes. At this time, cysto was performed showing a normal appearing urethra prostate 3 cm in length. In the bladder, distal to its right UO has a 2 cm papillary looking lesion. At this time, 6 ml of contrast was injected up right ureter, 6 ml of contrast was injected up left ureter. No filling defects. Rapid emptying. Resectoscope was then placed. The tumor was resected in total. Electrocautery was [used] for hemostasis. The chips were evacuated out, sent for specimen. The patient then had a 16-french Foley catheter placed, return of clear yellow urine. Extubated and taken to recovery room in good condition.

On June 9, 2017, Mr. Walker was thereafter seen at the Troy Regional Medical Center by Timothy L. Eakes, MD, Roentgenologist. Dr. Eakes records from that date state as follows:

**Clinical indication:** History of bladder tumor removal.

**CT Scan of Chest Six Pack/Nine:** technique: serial axial images of the chest were done following the intravenous injection of 100cc of Omnipaque 300 and

lung and mediastinal windows are evaluated in the axial projection with coronal reconstruction similar windows also being evaluated. Automated exposure control was utilized.

**Findings:**  There is pleural scarring in the left side of the chest with associated pleural calcification and there is elevation of the left hemidiaphragm.  There are multiple metallic foreign bodies in the area of the left shoulder and upper chest producing some streak artifact though active pulmonary infiltration or mass type lesion is seen. The markings in the right of the lung are slightly prominent but not mass like in nature. There are some generalized arteriosclerotic changes. There are some degenerative changes within the included spine.  The included great vessels are of normal caliber.   No other significant findings are noted.

**CT Scan of Abdomen 6/9:** technique: serial axial images of the abdomen were done following the intravenous injection of 100 cc of Omnipaque 300 with GI contrast being utilized soft tissue windows are evaluated in the [axial] projection with coronal reconstruction soft tissue windows are also being evaluated.  Automated exposure control was utilized.

**Findings:** The liver, spleen and gall bladder appear normal but the [latter] could be better evaluated ultrasonographically if clinically warranted. The adrenal glands and pancreas appear normal.  There are mild to moderate generalized arteriosclerotic changes and [the] caliber of the abdominal aorta is normal. There are scattered metallic pellets in the area of the abdomen some of which [are] in the abdominal wall and others [are] in the intra-abdominal.  The kidneys function following contrast administration and appear normal other than right bilateral cysts at least one in each kidney.  The larger is on the right at 2 cm in diameter.  There are mild to moderate degenerative changes within the included spine greater inferiorly within the lumbosacral region.  There is prominence of feces in the colon.

**CT Scan of Pelvis:** technique: Serial actual images of the pelvis were done with soft tissue windows being evaluated.

**Findings:** The appendix appears normal. There is mild prominence of feces in the distal colon. There are multiple metallic pellets in the pelvic area. There is a filling defect in the right side of the bladder posterolaterally with some wall thickening which is suspicious of a mass but could be at least in part related to recent surgery. Recommend clinical correlation. The length of the area involved is approximately 2 cm. The prostate is normal in size with mild intrinsic calcification. There is ectasia of both inguinal canals. No ascites or free air is seen. No other significant findings are noted.

Mr. Walker was followed up by the urologist, Robert Schuyler, M.D., at Urological Associates in Dothan, on June 13, 2017. Dr. Schuyler's notes state in part as follows:

Patient is a 70-year old with hypertension, diabetes, prostate cancer: treated with radiation in 2011. Last PSA was 0.24, who follows-up today after this TURBT. Patient has no post- biopsy difficulties.

\* \* \*

**Assessment/Plan**

**Lymphoma or Bladder cancer**: Talked to Dr. Misischia obtaining a non-contrast CT scan of the chest, abdomen, and pelvis today and she will see him after this to discuss treatment options. For his prostate cancer PSA was 0.24. Patient is going to follow-up with me in six months for PSA and also check status.

On July 9, 2017, Mr. Walker complained of again having problems urinating.

Mr. Walker was seen and evaluated by a nurse on July 10, 2017.

Mr. Walker was sent out to see an oncologist on July 13, 2017. The notes from the physician from July 13, 2017 were recorded as follows:

* * *

**Assessment/plan:** Patient is a 70 year old African-American male with history of prostate carcinoma. Status post treatments as mentioned above currently has extranodal marginal zone lymphoma involving the bladder. He needs further staging work-up. Will request cystoscopy procedure notes from urologist. Will check CBC, CMP, PSA, LDH, HIV and Hepatitis B and Hepatitis C serology today. Will request PET/CT scan for staging work-up as he has mediastinal lymphadenopathy. Based on the results, he may require bone marrow biopsy and then consider treatment as appropriate. Discussed with the patient extensively regarding his diagnosis, staging work-up and treatment options as appropriate. Multiple questions he had were answered to his satisfaction. He will RTC for follow up after the above work-up is completed. He was advised to contact me in the inter[im] with any questions or concerns. . . .

On July 31, 2017, I consulted with Richard R. Kosierowski, M.D., an Oncologist who is Board Certified in Internal Medicine and Medical Oncology. Dr. Kosierowski's opinions are attached hereto and state:

. . . .

**S:** 70-Year-Old with marginal Zone NHL

**O:** Patient with HX of prostate cancer S/P XRT and hormones

Off all therapy since 2011 with an acceptable PSA of 0.24. Recent bladder biopsy from 5/2017 with fragments of extranodal marginal zone NHL. Staging CT from 6/2017 with non specific mediastinal nodes of 1.5 cm. Current request for PET/CT for complete staging

**A:** Marginal zone NHL

**P:** While PET/CT may be an appropriate test for patients with marginal zone NHL, the test is not necessary and will add little to the patients treatment plan.

If the PET were negative, the patient could have localized marginal zone NHL and therefore can be considered for 'curative' measure. However, the only curative option would be either cystectomy or further XRT to the bladder and neither of these options would be indicated given the indolent nature of this NHL

If patient had a + PET/CT for mediastinal nodes, the patient is at least Stage III. Therapy for advanced marginal zone is only to be considered if patient meets GELF criteria.

His only complaints are some urinary burning

I do not think that systemic therapy is indicated regardless of the results of the PET/CT

Patient needs continued on site eval of PSA/DRE as F/U of prostate cancer[.] [Also] needs on site F/U for signs/symptoms of progressive NHL such as bulky adenopathy or cytopenias etc (GELF criteria)

The medical necessity of the bone marrow ASP and biopsy is likewise questioned at this point.

I recently saw Mr. Walker on August 9, 2017. Mr. Walker was recently diagnosed with non-Hodgkins Lymphoma that had localized into the bladder.

Mr. Walker is a 70 year old patient with marginal zone non-Hodgkin's Lymphoma with a history of prostate cancer prior to incarceration. Status post radiotherapy and hormones. Mr. Walker has been off all therapy since 2011 with an acceptable PSA of 0.24. Mr. Walker had a recent bladder biopsy from May 2017 with fragments of extranodal. Marginal zone NHA staging CT from June 2017 with non-specific mediastinal nodes of 1.5 cm. The PET/CT test is not necessary at this juncture and will add little to the patient's treatment plan if the PET were negative. The patient could have

localized marginal zone lymphoma and therefore can be considered for "curative" measures. However, the only curative option would be either cystectomy or further chemotherapy to the bladder and neither of these options would be indicated given the indolent nature of this lymphoma. Therapy for advanced marginal zone is only to be considered if patient meets Group d'Etude des Lymphomes Folliculaires (GELF) criteria. The patient's only complaints are some urinary burning and systematic therapy is not indicated regardless of the results of the PET/CT. The patient needs to be continued with onsite evaluation of PSA/DRE as a follow up of prostate cancer. The patient needs onsite follow-up for signs and symptoms of progressive non-Hodgkin's Lymphoma such as bulky adenopathy or cytopenias, etc. (GELF criteria).

Mr. Walker continues to be seen and evaluated by myself and the medical staff at the Easterling Correctional Facility.

Mr. Walker has been regularly seen by both myself, as Mr. Walker's treating physician, as well as outside specialists for his medical concerns.

Mr. Walker's medical needs have at no time been delayed or denied.

[In my opinion,] Mr. Walker has always been treated within the standard of care of physicians practicing medicine in the state of Alabama.

Doc. 20-1 at 3–11 (asterisks in original).[8]

The medical records likewise establish that medical personnel prescribed antibiotics, including Bactrim and Cipro, for treatment of Walker's urinary tract infection. Doc. 20-1 at 43, 80. Walker also received UTA, a combination medication used to treat bladder irritation commonly caused by a urinary tract infection. Doc. 20-1 at 80.

Under the circumstances of this case, the court finds that the course of treatment undertaken by the medical defendants did not violate Walker's constitutional rights. There is no evidence upon which the court could conclude that the defendants acted in a manner

---

[8]The other medical defendants, nurse Wilson and nurse Bush, filed affidavits detailing their lack of personal interaction with Walker and denying any deliberate indifference to his medical needs by medical personnel involved with his treatment. Doc. 20-2 at 3–4; Doc. 20-3 at 3–4.

that was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Harris*, 941 F.2d at 1505 (internal quotations and citation omitted). Rather, the evidence before the court demonstrates that medical personnel evaluated Walker each time he reported to the health care unit for treatment of his medical conditions, prescribed medication to him in accordance with their professional judgment, ordered various tests to aid in their assessment and treatment of his conditions and referred him to off-site specialists for examination, evaluation, additional tests and any treatment these specialists deemed necessary. Whether the facility's medical personnel "should have [utilized] additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545 (internal citation omitted). Furthermore, to the extent the claims for relief presented by Walker sound in negligence or medical malpractice, neither of these constitutes deliberate indifference actionable in a § 1983 case. *Farmer*, 511 U.S. at 836; *Taylor*, 221 F.3d at 1258; *Matthews*, 282 F. App'x at 771. Finally, insofar as Walker complains Dr. Darbouze should have pursued a mode of treatment other than that prescribed, this allegation does not "rise beyond negligence to the level of [deliberate indifference]." *Howell v. Evans*, 922 F.2d 712, 721 (11th Cir. 1991); *Hamm*, 774 F.2d at 1575 (holding that inmate's desire for a different mode of medical treatment fails to establish deliberate indifference).

As a result, the court concludes that the medical treatment provided to Walker did not constitute a violation of the Eighth Amendment. Walker's conclusory assertions of inadequate medical treatment do not create a question of fact in the face of contradictory,

contemporaneously created medical records.  *Whitehead v, Burnside*, 403 F. App'x 401,

403 (11th Cir. 2010) ("Although [Plaintiff] attempts to overcome summary judgment by

offering his own sworn statement[s] . . . to support his allegations, the contemporaneous

medical records and opinions of the examining medical [professionals] show that this

purported evidence is baseless."); *see Scott*, 550 U.S. at 380 (where a party's story "is

blatantly contradicted by the record, so that no reasonable jury could believe it, a court

should not adopt that version of the facts for purposes of ruling on a motion for summary

judgment.").

In sum, based on the well-established law cited herein, neither Walker's desire for

a different mode of medical treatment nor his disagreement with the treatment provided to

him by the prison's medical personnel constitutes deliberate indifference.  Additionally,

Walker has failed to present any evidence which indicates the medical defendants knew

that the treatment provided to him created a substantial risk to his health and with this

knowledge consciously disregarded such risk.  In addition, even assuming the medical

defendants knew of a substantial risk to Walker's health, the defendants may nonetheless

"be found free from liability" despite the fact that he developed a cancerous tumor, where,

as here, they "responded reasonably to the risk[.]"  *Farmer*,  511 U.S. at 844; *Swain*, 961

F.3d 1276 at 1286.

> A resulting harm … cannot alone establish a culpable state of
> mind. *Cf. Wilson v. Seiter*, 501 U.S. 294, 303, 111 S.Ct. 2321, 115 L.Ed.2d
> 271 (1991) (stating that "the 'wantonness' of conduct" doesn't "depend[ ]
> upon its effect upon the prisoner"); *Wilson v. Williams*, No. 20-3447, 961
> F.3d 829, 842–43 (6th Cir. June 9, 2020) (rejecting the contention that "the
> [Bureau of Prisons] was deliberately indifferent. to petitioners' health and

safety because [its] actions have been ineffective at preventing the spread of [a potentially fatal disease]").

*Swain*, *supra*.   The record is therefore devoid of evidence showing that defendants Darbouze, Wilson and Bush acted with deliberate indifference to Walker's medical needs. Consequently, summary judgment is due to be granted in favor of these defendants on this claim.

   **3.  Correctional Defendant.**  To the extent the complaint seeks relief from warden Myers for his failure to intervene with the medical treatment provided by health care professionals, Walker is due no relief.

   Myers avers that Walker had access to treatment from professional medical personnel employed by Corizon, the prison system's former contract medical provider, while incarcerated at Easterling and received treatment from the medical staff throughout the time about which he complains.  Doc. 27-1 at 3.  The medical records also demonstrate that Walker received additional treatment from off-site medical specialists.  Myers, who is not a medical professional, also asserts that he relied on the professional judgments of the prison system's medical personnel regarding the treatment afforded to Walker and did not have any involvement  with such treatment.  Doc. 27-1 at 3.  Myers further maintains he had no knowledge of any inadequacy in the treatment provided to Walker by medical professionals.  Doc. 27-1 at 3.

   A defendant who is not a physician cannot "be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor[,]" where the defendant had no knowledge

or reason to believe the inmate was not receiving treatment. *Durmer v. O'Carroll, 991,* 991 F.2d 64, 69 (3rd Cir. 1993); *Spruill v. Gillis,* 372 F.3d 218, 236 (3d Cir. 2004) (holding that "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official like [defendant] will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.").

It is apparent from the amendment to the complaint that Walker believes Myers had a duty to intervene in his treatment simply because Walker did not agree with the course of treatment undertaken by Dr. Darbouze.  It is undisputed that Walker was being seen, evaluated and treated by prison medical personnel and off-site specialists.  While Walker was not satisfied with the treatment prescribed by the prison's medical staff, the record shows that the treatment provided was that warranted by the symptoms associated with his conditions and various results of tests performed on Walker.  The record contains no evidence showing defendant Myers knew or had reason to believe Walker was not receiving appropriate treatment.  As such, warden Myers, who is not a physician or health care professional and lacks formal medical training, did not act with deliberate indifference for failing to interfere with the medical treatment provided to Walker.

Insofar as Walker seeks to hold defendant Myers liable for the treatment provided by medical professionals, he is likewise entitled to no relief as

> [t]he law does not impose upon correctional officials a duty to directly supervise health care personnel, to set treatment policy for the medical staff or to intervene in treatment decisions where they have no actual knowledge that intervention is necessary to prevent a constitutional wrong. *See Vinnedge v. Gibbs*, 550 F.2d 926 (4th Cir. 1977) (a medical treatment claim cannot be

> brought against managing officers of a prison absent allegations that they
> were personally connected with the alleged denial of treatment). Moreover,
> "supervisory [correctional] officials are entitled to rely on medical judgments
> made by medical professionals responsible for prisoner care. *See, e.g.,*
> *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3rd Cir. 1993); *White v. Farrier*, 849
> F.2d 322, 327 (8th Cir. 1988)." *Walker v. Limestone County, Ala.,* 198
> Fed.Appx. 893, 897 (11th Cir. 2006).

*Cameron v. Allen*, et al., 525 F.Supp.2d 1302, 1307 (M.D. Ala. 2007).

Since defendant Myers did not act with deliberate indifference to Walker's medical needs, he is entitled to qualified immunity from the request for monetary damages made against him in his individual capacity.  Moreover, due the lack of deliberate indifference, Walker is likewise due no declaratory or injunctive relief from defendant Myers.  Summary judgment is therefore due to be granted in favor of defendant Myers on these requests for relief.

## C.  Respondeat Superior

With respect to Walker's claim that Myers, as warden, is responsible for the actions of the prison's medical personnel because he is their superior, Doc. 7 at 1, this claim also entitles Walker to no relief.  Initially, the record is devoid of evidence that warden Myers exerts any authority over health care personnel regarding the manner in which medical treatment is provided to inmates; instead, the evidence establishes that he has no such authority.

Assuming *arguendo* that defendant Myers exerted some control over those persons responsible for the provision of medical treatment to inmates, the law is well-settled "that Government officials may not be held liable for the unconstitutional conduct of their subordinates [or co-workers] under the theory of *respondeat superior* [or vicarious

liability]. . . .  A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed [alongside,] by or under him, in the discharge of his official duties.  Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (internal quotations, citation and parentheses omitted); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (holding that "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."); *Marsh v. Butler County*, 268 F.3d 1014, 1035 (11th Cir. 2001), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) (holding that a supervisory official "can have no respondeat superior liability for a section 1983 claim."); *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir.2003) (concluding supervisory officials are not liable on the basis of respondeat superior or vicarious liability); *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999 (holding that 42 U.S.C. § 1983 does not allow a plaintiff to hold supervisory officials liable for the actions of their subordinates under either a theory of respondeat superior or vicarious liability.). "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677, 129 S.Ct. 1949.  Thus, liability for actions of the medical defendants could attach to warden Myers only if this defendant "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection

between [their] actions . . . and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360.

The record is clear that defendant Myers did not personally participate or have any involvement, direct or otherwise, in the medical treatment provided to Walker. It is undisputed that medical personnel made all decisions relative to the treatment provided to Walker and provided this treatment to him in accordance with their professional judgment. In light of the foregoing, defendant Myers can be held liable for decisions of medical personnel only if he undertook actions which bear a causal relationship to the purported violation of Walker's constitutional rights.

To establish the requisite causal connection and therefore avoid entry of summary judgment in favor of the correctional defendant, Walker must present sufficient evidence which would be admissible at trial of either "a history of widespread abuse [that] put[] [the defendant] on notice of the need to correct the alleged deprivation, and [he] fail[ed] to do so[,]" implementation of "a . . . custom or policy [that] result[ed] in deliberate indifference to [the plaintiff's medical needs], or . . . facts [that] support an inference that [the correctional defendant] directed the [facility's health care staff] to act unlawfully, or knew that [the staff] would act unlawfully and failed to stop them from doing so." *Cottone*, 326 F.3d at 1360 (internal punctuation and citations omitted). After extensive review of the pleadings and evidentiary materials submitted in this case, it is clear that Walker has failed to meet this burden.

The record before the court contains no evidence to support an inference that defendant Myers  directed medical personnel to act unlawfully or knew they would act

unlawfully and failed to stop such action.  In addition, Walker has presented no evidence of obvious, flagrant or rampant abuse of continuing duration regarding his receipt of medical treatment in the face of which defendant Myers failed to take corrective action; instead, the undisputed medical records indicate that Walker had continuous access to health care personnel and received treatment for his medical needs from both the facility's medical staff and off-site specialists.  The undisputed records also demonstrate that the challenged course of medical treatment did not occur pursuant to a policy enacted by defendant Myers.  Thus, the requisite causal connection does not exist in this case and liability under the custom or policy standard is not justified.  *Cf. Employment Div. v. Smith*, 494 U.S. 872, 877, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990); *Turner v. Safely*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

For the foregoing reasons, summary judgment is therefore due to be granted in favor of defendant Myers as to liability based on the theory of respondeat superior.  Furthermore, "[i]n light of the Court's determination [set forth herein] that there was no constitutional deprivation, there is no basis for supervisor liability."  *Nam Dang by & through Vina Dang v. Sheriff, Seminole Cnty. Florida*, 871 F.3d, 1278 1283 (11th Cir. 2017) (citing *Gish v. Thomas*, 516 F.3d 952, 955 (11th Cir. 2008); *Beshers v. Harrison*, 495 F.3d 1260, 1264 n.7 (11th Cir. 2007)).

### D.  Conspiracy

Walker makes the conclusory allegation that nurse Wilson "plotted" with the other defendants to deny him medical treatment.  The court construes this to assert a conspiracy claim against the defendants.

35

To proceed on a conspiracy claim under 42 U.S.C. § 1983, "a plaintiff must show that the parties reached an understanding to deny the plaintiff his or her rights [and] prove an actionable wrong to support the conspiracy. . . .   [T]he linchpin for conspiracy is agreement[]."  *Bailey v. Board of County Comm'rs of Alachua County*, 956 F.2d 1112, 1122 (11th Cir.), *cert. denied*, 506 U.S. 832 (1992) (internal quotations and citation omitted).  In order for a plaintiff "to establish the understanding or willful participation required to show a conspiracy, . . . [he] must [produce] some evidence of agreement between the defendants[.]"  *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1283–84 (11th 2002) (internal quotation marks omitted).  To demonstrate a conspiracy viable under 42 U.S.C. § 1983, the plaintiff "must [also] show an underlying actual denial of [his] constitutional rights."  *GJR Investments, Inc. v County of Escambia, Fla.*, 132 F.3d 1359, 1370 (11th Cir. 1998), *rev'd on other grounds by Randall v. Scott*, 610 F.3d 707, 709 (11th Cir. 2010).  "Merely "stringing together" acts of individuals is insufficient to demonstrate the existence of a conspiracy.  *Harvey v. Harvey*, 949 F.2d 1127, 1133 (11th Cir. 1992); *Fullman v. Graddick*, 739 F.2d 553, 556–57 (11th Cir. 1984) (holding that a vague and conclusory allegation of a conspiracy fails to state a claim upon which relief can be granted).  A plaintiff is required to provide more than a label or a conclusion, such as merely stating the defendants "plotted" or "conspired" against him.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  An agreement to violate a plaintiff's constitutional rights must be shown by sufficient facts to suggest an agreement was actually made.  *Id.* at 556.  "[A] bare assertion of a conspiracy will not suffice. . . . and a conclusory allegation of agreement at some unidentified point does not supply facts adequately to show

illegality." *Id*. at 556–57.  A plaintiff merely placing the word "conspiracy" or "plotted" in a complaint wholly fails to state a claim which survives a court's review under 28 U.S.C. § 1915(e)(2)(B).  *See Hadley v. Gutierrez*, 526 F.3d 1324, 1332 (11th Cir. 2008).  In sum, "[i]t is not enough to simply aver in the complaint that a conspiracy existed." *Allen v. Secretary, Florida Dept. of Corrections*, 578 F. Appx. 836, 840 (11th Cir. 2014) (quoting *Fullman*, 739 F.2d at 557).

Other than his suppositious and conclusory allegation of a plot or conspiracy among the defendants, Walker presents nothing which suggests the existence of any such act nor can this court countenance the existence of any evidence which would indicate that the defendants plotted or conspired to deprive Walker of his constitutional rights.  His "naked assertion[s]" of a plot without "supporting operative facts" fails to state a claim viable under 42 U.S.C. § 1983.  *Phillips v. Mashburn*, 746 F.2d 782, 785 (11th Cir. 1984); *GJR Investments*, 132 F.3d at 1370; *Harvey*, 949 F.2d at 1133; *Fullman*, 739 F.2d at 556–57. In addition, the court has found that the defendants did not act with deliberate indifference to Walker's medical needs.  Thus, his allegation of a conspiracy is likewise not based on any underlying constitutional violation.  As such, the defendants are entitled to summary judgment on the conspiracy claim lodged against them.

## IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.      The defendants' motions for summary judgment be GRANTED.

2.      Judgment be GRANTED in favor of the defendants.

3.      This case be DISMISSED with prejudice.

4.      Costs be taxed against the plaintiff.

On or before **August 18, 2020** the parties may file objections to this Recommendation.  A party must specifically identify the factual findings and legal conclusions in the Recommendation to which the objection is made; frivolous, conclusive, or general objections will not be considered.

Failure to file written objections to the proposed findings and legal conclusions set forth in the Recommendations of the Magistrate Judge shall bar a party from a *de novo* determination by the District Court of these factual findings and legal conclusions and shall "waive the right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice.  11TH Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993) ("When the magistrate provides such notice and a party still fails to object to the findings of fact and those findings are adopted by the district court the party may not challenge them on appeal in the absence of plain error or manifest injustice."); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 4th day of August, 2020.


    /s/ Stephen M. Doyle
STEPHEN M. DOYLE
UNITED STATES MAGISTRATE JUDGE